UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
For Online Publication Only
-----------------------------------------------------------------X
ANTHONY BENSON,

                          Petitioner,

               -against-                        **MEMORANDUM AND ORDER**
                                                       14-CV-06099 (JMA)
SUPERINTENDENT H. GRAHAM,

                         Respondent.
-----------------------------------------------------------------X
**APPEARANCES:**

Anthony Benson
       *Pro se Petitioner*

Grazia R. DiVincenzo
Suffolk County District Attorney's Office
200 Center Drive
Riverhead, NY 11901
       *Attorney for Respondent*

**AZRACK, United States District Judge:**

      Anthony Benson ("Benson"), proceeding pro se, petitions this Court for a writ of habeas

corpus under 28 U.S.C. § 2254. Benson pled guilty to one count of robbery in the first degree and

was sentenced as a persistent violent felony offender due to his prior convictions. He is presently

incarcerated and serving an indeterminate term of twenty-years to life imprisonment. For the

following reasons, Benson's petition is DENIED in its entirety.

## I. BACKGROUND

### A. Pre-Trial Proceedings and Plea

#### 1. The Indictment and Petitioner's Psychiatric History

      Benson was arrested on November 10, 2005 in connection with the robbery of a Gull gas

station in Suffolk County. (Feb. 26, 2007 Suppression Hearing Tr. at 22–27, ECF No. 7-16.) After

his arrest, he provided three police officers with ten statements confessing to robberies that had occurred between July 1, 2005 and November 10, 2005. (Id. at 7–16 128, 129, 140, 152, 162, 172, 181.) After four of these statements, Detective Joseph Brittelli took Benson on a "tour" to various locations that had been robbed. (Id. at 130–138.) Benson identified details of these robberies, such as the door he entered, the location where the driver had parked the car, and the color of the pillowcase in which he stored the money. (Id.)

Benson was subsequently indicted for sixteen counts of Robbery in the First Degree (a class B violent felony), four counts of Attempted Robbery in the First Degree (a class C violent felony), one count of Criminal Possession of a Weapon in the Third Degree (a class D violent felony), and one count of Criminal Possession of Stolen Property in the Fourth Degree (a class E felony).

Benson has an extensive psychiatric history that reaches back to his childhood. In 1983, when he was thirteen, he was admitted to Sagamore Psychiatric Center for two weeks. (11/28/2006 Evaluation by Dr. Palma-Aquino ("2006 Palma Evaluation") at 1, ECF No. 7-6.) He also has an extensive history of crack/cocaine and marijuana abuse that began in 1987. (Id.) Furthermore, when he was incarcerated for Armed Robbery from 1989 through 2001, he was admitted to the Central New York Psychiatric Center on multiple occasions. (Id.) Following the completion of his sentence, he was hospitalized, primarily at the Pilgrim Psychiatric Center ("PPC"), until his discharge from PPC on June 23, 2005. (Id.)

### 2. The First CPL § 730.30 Examination and Hearing

On October 17, 2006, upon defense counsel's request, the court ordered a CPL § 730.30 examination to determine Benson's mental state. (Oct. 17, 2006 Hearing Tr. at 7, ECF No. 7-12.) Benson's counsel requested the examination because he felt that Benson was unable to assist him

at trial based on, among other things, Benson's professed belief that "the court system and the prosecution [were] the devil, [and] that he [was] God." (Id. at 8.) The court ordered this examination although it suspected that Benson was fit to stand trial, stating that, "his stated answers to the Court's questions warrant an examination, notwithstanding the fact [those answers] . . . are at direct variance with his demeanor at this time." (Id. at 7–8.) The court observed, "[Benson] has always been obedient to the Court's mandates when it comes to that, and he has politely, in a measured way, answered the Court's questions. It's just the answers themselves, which seem somewhat bizarre." (Id. at 10.) The court stated that it was unclear at that time whether those bizarre answers were "a manifestation of mental illness" or "simply the desire to avoid going to trial." (Id.)

In November 2006, Benson was examined by Dr. Brett Goldberg and Dr. Bethzaida Palma-Aquino from PPC. (2006 Palma Evaluation; 11/28/2006 Evaluation by Dr. Goldberg ("Goldberg Evaluation"), ECF No. 7-6.) Both doctors diagnosed Benson as having Bipolar Disorder and Antisocial Personality Disorder. (Id.) Dr. Goldberg reported that, in his opinion, Benson was operating at a "cognitive level of average intelligence" and his "cognitive ability, knowledge of the legal system and the charges against him [were] sufficient for him to aid in his own defense." (Goldberg Evaluation.) Dr. Goldberg noted that "[Benson's] religious preoccupation and theatrical nature will be apparent in all aspects of his interaction, and may continue to result in somewhat disruptive or bizarre behavior, but did not significantly interfere with his ability to participate in [his] capacity interview and should not significantly interfere with his ability to participate in his own defense." (Id.) Similarly, Dr. Palma noted, "[t]hough Mr. Benson as [sic] this time displays mood liability, hyperproductive and tangential speech and verbalizes delusions,

he has adequate understanding of the legal system therefore it is the opinion of this clinician that he has the capacity to cooperate with his lawyer for his own defense." (2006 Palma Evaluation.)

On January 22, 29, and 30 of 2007, the court held a CPL § 730.30(2) hearing to determine the propriety of the CPL § 730.30 examination reports. On January 22, after Benson interrupted Dr. Goldberg's testimony several times with irrelevant and insulting exclamations, the court warned Benson that he would be removed from the courtroom if he continued this behavior. (Jan. 22, 2007 730.30 Hearing Tr. at 59, ECF No. 7-13.) During the January 29 hearing, Benson was removed from the courtroom for continuing to rant about various inappropriate topics despite the court's warnings, including accusing the court and his attorney of being the devil and being racist and claiming that they wanted to turn Benson into a homosexual. (Jan. 29, 2007 730.30 Hearing Tr. at 4–8, ECF No. 7-14.)

Both Dr. Goldberg and Dr. Palma testified that Benson was originally admitted to PPC with a diagnosis of Bipolar I Disorder based on his diagnosis history. (Id. at 23–24; Jan. 22, 2007 730.30 Hearing Tr. at 19.) Dr. Palma explained that Benson's diagnosis was then changed to "mood disorder, NOS, 'not otherwise specified' and malingering" on January 17 or 18 of 2007. (Jan. 29, 2007 730.30 Hearing Tr. at 24.) Dr. Palma defined "malingering" as making up or exaggerating symptoms for some secondary gain. (Id. at 25.) Dr. Goldberg stated that the diagnosis was changed because Benson did not present symptoms to a level that met the criteria for Bipolar I Disorder; he "didn't meet full criteria for any particular emotion disorder, but he still has some symptoms of emotional disorder." (Jan. 22 730.30 Hearing Tr. at 20.) Dr. Palma further testified that "after the first week it started to be prominent that there is a secondary gain to his behavior." (Jan. 29 730.30 Hearing Tr. at 24.) Dr. Palma explained that she did not mention malingering in her notes until much later, however, because malingering is a "diagnosis by

exclusion" and "should always come at the end, when you have observed and you have seen, you know, the progress of an illness." (Jan. 30, 2007 730.30 Hearing Tr. at 37, ECF No. 7-15.) Dr. Palma testified that, on January 17 or 18, Benson had screamed, "Dr. Palma, I'll never go to jail, I'll put up a show for the district attorney and for my lawyer." (Id. at 55.) Dr. Palma admitted, on cross examination, that she continued to administer drugs to Benson for grandiose delusions even after she suspected him of malingering. (Jan. 29, 2007 730.30 Hearing Tr. at 48.)

After the doctors' testimony, Benson testified on January 30. During this testimony, Benson did not answer the attorneys' questions, and instead ranted about his hatred and fear of homosexuals and his belief that he communicated with Jesus and was sent to preach against homosexuality and other issues. (Jan. 30, 2007 730.30 Hearing Tr. at 47–69.) When asked if he knew Judge Hudson, Benson stated that the Judge was a "faggot, child-molesting, no good, microwaving, disease-spreading, dirty, rotten, stinking faggot" and that his purpose was "[t]o talk [Benson] into homosexual land and make [Benson] gay." (Id. at 52–53.) Benson was removed from the courtroom after the court was unable to stop these outbursts. (Id. at 73.)

After this incident, the court ruled that Benson was competent, explaining that, while Benson suffered from a mental illness, it did not rise to the level to make him incompetent to stand trial because he was "cognizant of this case; he [was] cognizant of his surroundings; he [had] free will and [could] control his behavior." (Id. at 87.)

### 3. The __Huntley__ and __Wade__ Suppression Hearing

On February 22 and 27, March 1, and April 4 of 2007, the court held a combined suppression hearing pursuant to People v. Huntley, 204 N.E.2d 179 (N.Y. 1965) and United States v. Wade, 388 U.S. 218 (1967). The Huntley portion of the hearing was held to "consider the alleged voluntariness of any purported statements made by the defendant . . . to the police." (Feb.

26, 2007 Suppression Hearing Tr. 10.)  At this hearing, officers testified that Benson's confessions were voluntary and were preceded by his waiver of his <u>Miranda</u> rights.  (Feb. 27, 2007 Suppression Hearing Tr. at 128, 129, 140–88; Mar. 1, 2007 Suppression Hearing Tr. at 307–31, ECF No. 7-16.)  Benson's attorney argued that the officers were aware that Benson lived in a State Operated Community Residence and may have been taking medication, but did not investigate this further.  (Apr. 4, 2007 Suppression Hearing Tr. at 70, ECF No. 7-17.)  Counsel asserted that, instead, the officers took advantage of the fact that Benson was not in the right state of mind to make voluntary statements and made him sign as many confessions as possible.  (<u>Id.</u>)

The <u>Wade</u> portion of the hearing was held to determine whether a show-up identification procedure used by the police was unduly suggestive.  (<u>Id.</u> at 74–75.)  Police Officer David Leath testified that a passing motorist alerted Officer Leath and his partner to a robbery at a local gas station.   (Feb. 26, 2007 Suppression Hearing Tr. at 98.)  Following this encounter, they spotted Benson on the side of a house and placed him under arrest.  (<u>Id.</u> at 27.)  Thirteen minutes later, the officers and Benson arrived at the gas station for a show-up identification by the victim of the robbery, a gas station attendant.  (<u>Id.</u>)  As Officer Leath stood by the police car with Benson, about thirty feet away from the door of the gas station, another officer brought the victim to the door of the gas station.  (<u>Id.</u> at 28–29; Apr. 4, 2007 Suppression Hearing Tr. at 11.)  The victim indicated that Benson was the man who had robbed the gas station, identifying him based on his clothing and general size and build.  (Mar. 2, 2007 Suppression Hearing Tr. at 12, ECF No. 7-17.)  Defense counsel argued that the officers offered conflicting testimony about the identification procedure and that the procedure was highly suggestive.  (Apr. 4, 2007 Suppression Hearing Tr. at 62–67.)

At the conclusion of the hearing, the court stated it would issue a written decision after reviewing the record.  (<u>Id.</u> at 80.)  The record before this Court does not contain a written or oral

decision on the suppression motions. (Return ¶ 18.) However, other filings in the record indicate that the trial court did, in fact, deny Benson's motions to suppress his statements and the identification. (See 440.10 Motion to Set Aside Judgment at 3, ECF No. 8.)

**4. The Guilty Plea**

On March 10, 2008, Benson agreed to plead guilty to one count of robbery in the first degree and to be sentenced as a persistent violent felony offender in exchange for a sentence of an indeterminate term of twenty-years to life imprisonment.

During the plea colloquy, Benson did not engage in any disruptive outburst and generally responded directly to questions. His conduct and answers indicated that he understood what was occurring during the proceedings. In fact, before pleading guilty, Benson attempted to negotiate in open court for a better deal, stating to the court:

> Can I get a deal being that I'm mentally ill. Can I get a deal. You were the one who told me I was mentally ill through no fault of my own. I'm not a murderer or a rapist. I'm only in here -- I stole some money, yes. I don't think I deserve all this time.

(Plea Tr. at 3, Mar. 10, 2008, ECF No. 7-11.) After the court insisted that this agreement was more than fair because Benson could face incarceration of fifty-years to life if the sentences of each indictment were imposed concurrently, Benson again tried to negotiate with the court arguing, "I'll take fifteen to life, restitution, surcharge, and I'll take it." (Id. at 4–5.) The court reiterated that fifteen years was not the deal discussed, and after consultation with defense counsel, Benson stated, "Okay, I'll take it. Damn." (Id. at 6.)

After Benson was sworn in, he responded directly to questions, appeared to understand the questions and participated appropriately in the colloquy. When asked if he had discussed the deal with his attorney, Benson stated, "[y]es I discussed it, but he got me thinking I'm going to a hospital." (Id. at 7.) The court explained that, after sentencing, Benson would be placed in the

custody of the Department of Corrections and the court could only recommend that Benson receive mental health treatment. (Id. at 7–8, 20.) Benson indicated that he had enough time to discuss the plea with his attorney, stating that he "had over two years" and was "tired." (Id. at 8.)

After the court informed Benson that he was waiving his right to a trial by jury, Benson responded, "[w]hy waste that time. I know I'm guilty." (Id. at 9.) The court also informed Benson that, as part of his plea agreement, he was giving up his "right to appeal, and any basis that [he] may have for such an appeal." (Id. at 10.) When Benson responded that he had "[n]ot really" discussed this with his attorney, the court then gave Benson additional time to discuss this appeal waiver with defense counsel. (Id.) After this discussion, Benson stated, "that means I'm done" and affirmed that he was waiving his right to appeal. (Id. at 10–12.)

When asked if anyone had threatened or coerced him into making this plea, the following exchange occurred:

> THE DEFENDANT: Yes all you, all you. Out of fear. But, yes. I don't know the law.
>
> THE COURT: If you feel that you're being forced into this plea, Mr. Benson, no one will do so. You have a right to a fair trial.
>
> THE DEFENDANT: Why waste the taxpayer's money and go for fifty to life, and then I'm really done. You would be gunning for me.

(Id. at 12.) The court then explained that it was asking whether Benson had been threatened, not if he was afraid of the possible outcome of a trial. (Id. at 12–13.) Benson then affirmed that he had not been coerced. (Id.)

Benson stated that he was taking psychiatric drugs, but he did not know the names, and the court observed that he appeared clear-headed and able to participate in normal conversation. (Id. at 13–15.) When asked if he was having difficulty understanding the proceedings, Benson mused, "I never did life before. It's like you giving me life and – I didn't deserve it." (Id. at 14.) He

further revealed his understanding of the law and its application to his case by asking, "Can they change that law for a three time loser to a five time loser?," in reference to his status as a persistent violent felony offender. (<u>Id.</u> at 14–16.) After the court explained that it could not change the law, Benson even asked the court what would happen if the persistent violent offender statute was changed. (<u>Id.</u> at 26.)

When asked if he understood that he was admitting to an armed violent felony, Benson tried to defend himself, asserting, "Violent felony, it wasn't a violent act at all. Nobody got hurt, shot, paralyzed, killed, nothing. It was just a playground. Like poker, you know what I'm saying? So all that was going was the money." (<u>Id.</u> at 18.) The court explained that the legislature had designated this crime as an armed violent felony, and Benson stated he understood that. (<u>Id.</u> at 18–19.)

Finally, the court asked if Benson had received any other promises in return for his guilty plea. (<u>Id.</u> at 19.) Benson first responded by saying "not really" and then with "yeah-yeah-yeah that I go to a hospital." (<u>Id.</u>) After the court reiterated that it could only recommend Benson for medical and mental health treatment and again asked Benson if any other promises had been made to him in exchange for pleading guilty, Benson responded, "that is kind of a million dollar question." (<u>Id.</u> at 20.) The court then questioned Benson again and he affirmed that no other promises had been made to him. (<u>Id.</u> at 21.)

Benson then allocuted to the crime of robbery in the first degree. Specifically, he admitted that on July 1, 2005, he entered a Getty gas station wearing a mask and gloves and holding a loaded .38 caliber gun. (<u>Id.</u> at 22–23.) He confessed that he pointed the gun at the gas station attendant, said, "give me money," and left with the money he received. (<u>Id.</u> at 23–24.)

Notably, the plea colloquy contained none of the sustained rambling and outbursts that Benson had exhibited at other points, such as at the competency hearing.

## B. Post-Plea Proceedings

### 1. The Motion to Vacate the Plea

On September 17, 2008, Benson, proceeding with a new counsel that his family had retained to represent him, submitted a CPL § 440.10(1) motion to vacate his plea on the basis of incompetence. (440.10 Motion, Sept. 17, 2008, ECF No. 7-8; August 24, 2009 Tr. at 20.) Benson's counsel argued that, "while on the specific date of his plea he may have appeared clear-headed and competent to proceed, [he] was denied the opportunity to have extended and meaningful consultation with his attorney regarding his available options" due to his mental illness. (440.10 Motion, Sept. 17, 2008 at 5–6.) Benson's counsel asserted that that this "limited consultation with his attorney was insufficient to make an intelligent and informed decision."[1] (Id.)

In its response, the prosecution emphasized that Benson did not have limited time because he had in fact "appeared in court on no fewer than 45 separate occasions including the date of the plea, and had over two years to consult with his attorney." (Opp'n. to 440.10 Motion, Nov. 3,

---

[1] The § 440.10 Motion included an evaluation that a psychologist, Dr. Alan Klein, performed of Benson in September 2006, apparently at defense counsel's request. (Summary of Forensic Psychological Examination, ECF No. 7-8.) Dr. Klein was asked to offer an opinion as to Benson's mental state at the time of the alleged offenses. It does not appear that Dr. Klein was asked to opine on Benson's competence to stand trial. Defense counsel did not call Dr. Klein to testify at the competency hearing. It does not appear that Dr. Klein's report was submitted to the court until September 2008 when Benson submitted this report as part of his motion to vacate the guilty plea that he entered in March 2008.

Although Dr. Klein's evaluation indicated that Benson "suffers from a severe mental illness which has been present since his early adolescent years," Dr. Klein opined that "[t]he presence of mental illness, in and of itself, does not imply lack of responsibility. Mr. Benson is aware of the fact that commission of robberies is a legal offense and he is neither mentally or emotionally incapable of knowing or appreciating the wrongfulness of his acts." (Id.)

2008, ECF No. 7-9)  Furthermore, the prosecution argued that Benson's claim was "unsupported by the extensive history in this case and unsupported by the record."  (Id.)

On December 3, 2008, the court denied the motion in its entirety without a hearing, stating that Benson did not support his position with any evidence to show that he was incompetent. (Order on 440.10 Motion, Dec. 3, 2008 at 2, ECF No. 7-10.)  The court asserted that "absent sound evidence of incompetency, there is no basis to conclude that defendant's plea was other than knowing and voluntary."  (Id.)  The court also noted that, in the motion to vacate, Benson conceded that "at the time of his plea . . . the record will show that [Benson] stated he understood what was happening and the ramifications of his actions, and gave all the 'right' answers . . . ."  (Id.)

### 2. The Second CPL § 730.30 Examination

On February 25, 2009, the court ordered that a second CPL § 730.30 examination be conducted prior to Benson's sentencing.  (Order for Psychiatric Examination, Feb. 25, 2009, ECF No. 7-7.)  On March 17 and 18 of 2009, Benson was examined by Dr. Palma and Dr. James Bozinos.  (2009 Examination Reports, ECF No. 7-7.)  Dr. Palma reported that Benson "appeared to have understood the limits of confidentiality though his responses were always tainted with irrelevant statements," including calling the evaluators "devils" and calling himself the "Black Cross Christian."  (Id.)  She reported that the results of her examination "were highly suggestive that Mr. Benson is malingering psychopathology."  (Id.)  She also observed that outside of the examination, "[a]t the change of shift when the professionals are gone there is a change in his behavior, records indicate 'he talks loud but rational.'"  (Id.)  She concluded that although "Mr. Benson may present with psychiatric difficulty (Mood liability, hyperproductive pressured and tangential speech), he had adequate understanding of the legal system and he is again deemed to have the capacity to assist his lawyer for his defense."  (Id.)

Similar to Dr. Palma, Dr. Bozinos stated that Benson was "not cooperative with the evaluation and appeared to be exaggerating symptoms." (Id.) He noted that Benson "appeared to be experiencing symptoms of psychosis during this evaluation," such as rapid, pressurized speech and a loosening of associations, however, Benson "[did] not typically present in this fashion when professional staff [were] not present on the unit." (Id.) Dr. Bozinos also indicated that examination results suggested malingering because, inter alia, Benson was "endorsing very extreme and uncommon psychiatric symptoms" and "his reported symptoms [were] inconsistent with his observed behavior." (Id.) Dr. Bozinos concluded that "[t]hough [Benson] may be experiencing symptoms of a psychological disorder, it appears that they are being grossly exaggerated and motivated by secondary gain." (Id.)

### 3. Sentencing

Benson was sentenced on August 24, 2009. At the beginning of the sentencing proceeding, Benson was removed from the courtroom for refusing to follow the court's directions and engaging in inappropriate outbursts. (Aug. 24, 2009 Sentencing Tr. at 3–7, ECF No. 7-18.) After Benson's removal, his attorney stated that Benson had been completely unable to assist him or communicate with him over the past few months. (Id. at 15–16.) Before proceeding to sentencing, the court found, based on the two most recent competency examinations, that Benson was competent, explaining that "there is no question that the defendant, Mr. Benson, does understand the nature of the charges against him and is able, although he may be unwilling but is able to assist in his own defense." (Id. at 17.) Benson's counsel did not request a competence hearing on this second CPL § 730.30 examination, and no hearing was held.

After speaking with Benson, defense counsel reported to the court that Benson had made a series of insults against his attorney and his attorney's family and asserted that he could not be

sentenced because his case was too old and because he did not want to be represented by this attorney. (Id. at 20.) The Court then sentenced Benson, as a persistent violent felony offender, to an indeterminate term of twenty-years to life imprisonment in accordance with his plea bargain. (Id. at 23–38, 47.) This was the minimum sentence available to Benson under the law. (Id. at 46.)

### 4. The Direct Appeal

With the aid of appellate counsel, Benson appealed the trial court's judgment to the Second Department of the New York Appellate Division. On appeal, Benson's counsel argued: (1) the trial court should have allowed Benson to withdraw his plea of guilty because he was incapable of understanding or participating in the proceedings; (2) the trial court was required to hold a hearing to determine whether Benson had the capacity to proceed before sentencing him; and (3) the trial court's determination in January 2007 that Benson was capable of proceeding was not supported by the record. (Appellant's Br., ECF No. 7-1.)

In June 2011, the Second Department affirmed the trial court's judgment. (Appellate Div. Decision, June 28, 2011, ECF No. 7-3.) The court held that the "County Court properly determined that the defendant was competent to stand trial." (Id.) Additionally, the court found that Benson's "lucid and appropriate responses during the plea allocation" showed that his plea was knowingly, voluntarily, and intelligently made, and therefore, the "County Court providently exercised its discretion in denying the defendant's motion to withdraw his plea of guilty." (Id.)

Benson then requested leave to appeal that decision. In September 2011, the New York Court of Appeals denied that request. (Order Denying Leave, Sept. 23, 2011, ECF No. 7-5.) Benson did not petition to the United States Supreme Court.

## II. DISCUSSION

**A. <u>Standards of Review</u>**

### 1. Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a prisoner may file a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must demonstrate: (1) the exhaustion of state remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of state court decisions. <u>See</u> 28 U.S.C. § 2254.

### 2. Exhaustion

Generally, a court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is designed to provide state courts with the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." <u>Jackson v. Edwards</u>, 404 F.3d 612, 619 (2d Cir. 2005) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)). Therefore, the petitioner must show that he fairly presented his federal claim to the highest state court from which a decision can be rendered. <u>Daye v. Att'y Gen. of N.Y.</u>, 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts of the claim's federal nature.'" <u>Jackson v. Conway</u>, 763 F.3d 115, 133 (2d Cir. 2014) (quoting <u>Carvajal v. Artus</u>, 633 F.3d 95, 104 (2d Cir. 2011)).

Where the petition is a "mixed petition," containing both exhausted and unexhausted claims, the court can deny the unexhausted claims if they are plainly meritless. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Ortiz v. Marshall, No. 08-CV-8815, 2009 WL 3170300, at *7 (S.D.N.Y. Sept. 30, 2009) ("Federal courts retain the discretion to deny a petition including unexhausted claims on the merits when it deems those claims to be patently frivolous.").

### 3. Procedural Default

A federal court cannot review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the petitioner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012). This procedural bar applies even if the state court addressed a claim's merits in the alternative, but decided that claim on independent procedural grounds. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original).

"The concepts of procedural bar and exhaustion often interact in an important way." Dominguez v. Rock, No. 12-CV-3269, 2016 WL 542120, at *5 (E.D.N.Y. Feb. 9, 2016). "If a § 2254 petitioner has failed to present a claim to a state court but can no longer do so – for example,

if the time to file a state-court appeal has passed – then that claim is considered procedurally barred rather than unexhausted." Id. (citing O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999)); Lloyd v. Walker, 771 F. Supp. 570, 574 (E.D.N.Y. 1991) (noting that "[w]hen a petitioner has not properly presented his claim to a state for consideration on the merits, but it is clear that the state court would hold the claim procedurally barred, . . . the exhaustion requirement is satisfied," but, nonetheless, the petitioner is barred from litigating the merits of that claim in federal habeas proceedings) (internal quotation marks and citation omitted).

To overcome a procedural bar a petitioner must show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. To demonstrate cause, a petitioner must put forth that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, that the factual or legal basis for a claim was not reasonably available to counsel or that "some interference by officials … made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). A petitioner may also satisfy the cause requirement by demonstrating that his attorney's failure to comply with state procedural rules denied him constitutionally adequate representation. See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016). Generally, however, a petitioner cannot invoke this ground unless he first asserted the same independent Sixth Amendment ineffective assistance claim in state court and exhausted his state-court remedies with respect to that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 466, 451-52 (2000).

To satisfy the prejudice requirement, the petitioner must demonstrate that ground invoked by the petition to establish cause not only "created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage". <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982).

Even if a petitioner cannot establish cause and prejudice, a federal court may excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result. A petitioner can overcome a procedural bar by showing "that he is actually innocent of the crime for which he has been convicted." <u>Dunham v. Travis</u>, 313 F.3d 724, 730 (2d Cir. 2002) (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995)). To prevail, the petitioner must put forth "new reliable evidence . . . that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." <u>Schlup</u>, 513 U.S. at 324.

### 4. AEDPA Standard of Review

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.SC. § 2254(d). The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" <u>Jones v. Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13. A decision involves "an unreasonable

application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam)). This standard is "'difficult to meet.'" White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)), reh'g denied, 134 S. Ct. 2835 (2014). A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Williams, 529 U.S. at 389.

**5. Pro Se Status**

Benson "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997). But, in light of his pro se status, the Court will construe his submissions liberally and interpret them "to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). However, Benson is not excused from "compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (quoting Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981) (per curiam) (internal quotation marks omitted)).

**B. Claims for Relief**

Benson's handwritten petition and filings are difficult to comprehend. Construing the Petition liberally, the Court construes it to raise six grounds for relief. The Court liberally construes the Petition to raise the three arguments that Benson advanced on his direct appeal, namely:

(1) the trial court erred when it found him competent in January 2007;

(2) the trial court was required to hold a hearing to determine his competence prior to sentencing him; and

(2) the trial court should have allowed him to withdraw his plea of guilty or, at minimum, should have held a hearing on this issue.

The Court also construes Benson's petition to raise three unexhausted claims:

(1) he was denied effective assistance of counsel;

(2) his conviction was obtained by the use of a "coerced confession" because neither the judge nor the prosecution was entitled to question him at the plea hearing; and

(3) his conviction was "obtained by use of evidence gained pursuant to an unconstitutional search and seizure" in violation of the Fourth Amendment and his Fifth Amendment rights

were violated when the trial court declined his suppression motions which were the subject of the suppression hearing.

(See Pet.)

**1. The Competency Examinations, Competency Hearings, and Competency Determinations**

Liberally construed, Benson's petition raises three related grounds challenging the state court's rulings concerning his competency and motion to vacate his guilty plea. First, Benson asserts that the trial court erred in January 2007, when, after holding a competency hearing, the court found that Benson was competent to stand trial. Second, Benson contends that the trial court erred when, at his August 24, 2009 sentencing hearing, the trial court found him competent without holding a second competency hearing. Third, Benson asserts that the trial court erred in not granting his motion to vacate his plea in September 2008. None of these arguments have any merit.

*i. The Trial Court's January 30, 2007 Competency Determination*

The "Due Process Clause of the Fourteenth Amendment," prohibits the "criminal prosecution of a defendant who is not competent to stand trial." Edwards v. Superintendent, Southport C.F., 991 F. Supp. 2d 348, 376 (E.D.N.Y. 2013) (citing Drope v. Missouri, 420 U.S. 162 (1975); Pate v. Robinson, 383 U.S. 375 (1966)). "A defendant is incompetent to stand trial if 'he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'" Smith v. Rock, 554 F. Supp. 2d 505, 512 (S.D.N.Y. 2008) (quoting Drope, 420 U.S. at 171), aff'd, 344 F. App'x 656 (2d Cir. 2009). On habeas review, when the trial court has made an express finding of competence, "[t]his factual determination is entitled to a presumption of correctness which can only be overcome by clear and convincing evidence to the contrary." Luna v. Capra, No. 14-CV-2975, 2015 WL 8568316, at *8 (S.D.N.Y. Nov. 6, 2015) report and recommendation adopted, 2015 WL 8675394 (S.D.N.Y. Dec.

11, 2015). "It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." United States v. Nichols, 56 F.3d 403, 412 (2d Cir. 1995) (quoting United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986)). "The mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." Id. (quoting Dusky v. United States, 362 U.S. 402 (1960)).

The record does not contain clear and convincing evidence that the trial court erred in finding Benson competent.[2] Both of the doctors who evaluated Benson and testified at the competency hearing in January 2007 concluded that Benson was competent. In his appellate brief, Benson's counsel pointed to alleged flaws in these opinions that defense counsel stressed during cross-examination as well as Benson's own behavior at the competency hearing. (Appellant's Br. at 53–55.) These points do not come close to constituting the type of clear and convincing evidence that would be necessary to overcome the trial court's competency finding. Accordingly, the state court's competency determination was neither contrary to or an unreasonable application of federal law nor was it based on an unreasonable determination of the facts.

*ii. The Trial Court's Failure to Hold a Second Competency Hearing*

Benson argues that the trial court was required to hold an additional competency hearing before his sentencing after receiving the results of the second set of § 730.30 examinations. In support he cites to New York Criminal Procedure Law ("N.Y. C.P.L.") § 730.30, which states:

> 1. At any time after a defendant is arraigned . . . and before the imposition of sentence . . . the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person.

---

[2] It is far from clear that Benson's petition is even asserting that the trial court erred when it found him competent in January 2007. Even assuming, arguendo, that Benson raises this claim, it is clearly meritless.

2.  When the examination reports submitted to the court show that each psychiatric examiner is of the opinion that the defendant is not an incapacitated person, the court may, on its own motion, conduct a hearing to determine the issue of capacity, and it must conduct a hearing upon motion therefor by the defendant or by the district attorney. If no motion for a hearing is made, the criminal action against the defendant must proceed.

N.Y. C.P.L. § 730.30 (McKinney).

As an initial matter, "federal habeas corpus does not lie for errors of state law. . . . In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991)). Therefore, to the extent that Benson asserts that the trial court failed to follow the requirements of N.Y. C.P.L. § 730.30, this claim is not cognizable on habeas review.[3]

The Court will instead consider whether the trial court violated Benson's due process rights by not holding a second competency hearing. "It is well established that where the evidence 'raise[s] a sufficient doubt as to a defendant's competence to stand trial, the failure of the trial court to conduct a competency hearing sua sponte violates due process.'" Smith v. Rock, 344 F. App'x 656, 657 (2d Cir. 2009) (quoting Nicks v. United States, 955 F.2d 161, 168 (2d Cir. 1992)); see United States v. Nichols, 56 F.3d 403, 414 (2d Cir. 1995) ("[A] hearing is required only if the court has "reasonable cause" to believe that the defendant has a mental defect rendering him incompetent."). "Although the Supreme Court has not established a fixed standard to analyze whether a court should have conducted a competency hearing, it has identified a number of factors to consider, including attorney representations, prior medical opinions on competence to stand trial, evidence of a defendant's prior irrational behavior, and demeanor at trial." Smith, 554 F.

---

[3] The Court notes, however, that both examination reports following the second § 730.30 examination opined that Benson was not incapacitated, and neither Benson nor the prosecution moved for a hearing at the time of sentencing. Thus, Benson would not even have a colorable argument that the trial court was required to hold another competency hearing pursuant to N.Y. C.P.L. § 730.30.

Supp. 2d at 512. The Court must "ask whether it was <u>objectively unreasonable</u> for the state trial court to have concluded . . . that the circumstances <u>did not</u> present a reasonable ground for believing that [the petitioner] was incompetent." <u>Harris v. Kuhlmann</u>, 346 F.3d 330, 351–52 (2d Cir. 2003) (emphasis in original).

Admittedly, Benson's sentencing occurred in August 2009, over two years after the initial competency hearing was held in January 2007. "[H]olding one competency hearing at the beginning of the proceedings may not satisfy the constitutional requirement that courts establish that the defendant is fit to stand trial." <u>Johnson v. Keane</u>, 974 F. Supp. 225, 231 (2d Cir. 1997). In this case, however, there was no evidence indicating that Benson had become incompetent in the intervening years. In fact, Benson's conduct during the plea proceeding in March 2008 provided further evidence of his competence. During the plea colloquy, Benson was lucid and responsive to the questions asked by the Court, and did not engage in the type of rants, outbursts, and conduct that he had exhibited at some earlier court appearances. While defense counsel indicated at the August 2009 sentencing proceeding that Benson had been completely unable to assist him or communicate with him over the past few months, "[c]ourts are not required to accept the representations of defense counsel 'without question.'" <u>Harris</u>, 346 F.3d at 355. Notably, Benson had also been uncooperative prior to, and during, the January 2007 competency hearing and the trial court, after holding that hearing, found him to competent and able to control his behavior. (<u>See</u>, <u>e.g.</u>, Jan. 30, 2007 730.30 Hearing Tr. at 77–78.)

Furthermore, where, as here, "a trial court has reason to believe that a defendant is 'malingering' or exaggerating his mental difficulties in order gain an advantage in his case, the court is not required to delay the proceedings by ordering a competency hearing." <u>Alexis v.</u>

Griffin, No. 11-CV-5010, 2014 WL 3545583, at *15 (S.D.N.Y. July 18, 2014) report and recommendation adopted, No. 11-CV-5010, 2014 WL 5324320 (S.D.N.Y. Oct. 20, 2014).

Here, all four competency examinations found Benson to be competent to stand trial. Moreover, the second set of § 730.30 examinations conducted by Dr. Palma and Dr. Bozinos were performed only six months prior to sentencing. These examinations reaffirmed the findings of the trial court's initial competency findings, which were made after the hearing in 2007. Dr. Palma and Dr. Bozinos opined that Benson was malingering and concluded that although "[Benson] may be experiencing symptoms of a psychological disorder, it appears that they are being grossly exaggerated and motivated by secondary gain." (2009 Examination Reports, ECF No. 7-7.)

Additionally, the trial court interacted with Benson and observed his behavior on numerous occasions throughout the proceedings, including the plea hearing where Benson showed no signs of incompetence. See e.g., Alexis, 2014 WL 3545583, at *16 ("[B]ecause a trial judge has a "superior opportunity" to observe a defendant's conduct during proceedings, reviewing courts generally defer to the trial court's competency determination.").

In light of all of these considerations, it was not "objectively unreasonable for the state trial court to have concluded . . . that the circumstances did not present a reasonable ground for believing that [Benson] was incompetent." Harris, 346 F.3d at 351–52; see Alexis, 2014 WL 3545583, at *17–18 (finding that the state court was not required to order an additional competency hearing when petitioner had been hospitalized for mental illness following the initial hearing and exhibited disruptive behavior at trial because the trial judge had observed petitioner over the years and "reasonably [] concluded that Alexis' outbursts were merely an attempt to avoid the potentially harsh consequences awaiting him at the end of the trial").

Accordingly, the trial court's decision not to hold a second competency hearing was neither contrary to or an unreasonable application of federal law nor an unreasonable determination of the facts and Benson's claim concerning an additional competency hearing is denied.

### iii. Motion to Vacate Plea

The Petition also includes a brief excerpt from the portion of Benson's appellate brief that argued that the trial court erred when it denied Benson's motion to vacate his guilty plea and declined to hold a hearing on this issue. (Pet. at 12.) Construing the Petition liberally, the Court construes this excerpt to raise the argument Benson raised in his appellate brief—namely, that the trial court should have allowed him to vacate his plea and should have, at the very least, held a hearing concerning his motion to vacate his plea.

"[A] guilty plea is constitutionally acceptable under the Due Process Clause of the Fourteenth Amendment if it 'represents voluntary and intelligent choice among the alternative courses open to the defendant.'" Lebron v. Sanders, No. 02-CV-6327, 2008 WL 793590, at *12 (S.D.N.Y. Mar. 25, 2008) (quoting Hill v. Lockhart, 474 U.S. 52, 56 (1985)). As explained earlier, a defendant is not competent to plead guilty if "'he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'" Smith, 554 F. Supp. 2d at 512 (quoting Nicks v. United States, 955 F.2d 161, 168 (2d Cir. 1992).

In denying Benson's motion to vacate his plea, the trial court concluded that Benson was competent at the time he entered his guilty plea. his determination was neither contrary to or an unreasonable application of federal law nor was it based on an unreasonable determination of the facts.

As discussed supra, there is no evidence in the record that Benson's condition in March 2008 had changed since the January 2007 competency hearing such that the court was obligated

to hold another competency hearing. In fact, the evidence of Benson's competency was only strengthened by his conduct during the March 2008 plea hearing, during which Benson was coherent and did not engage in the type of rants and outbursts in which Benson had engaged during prior proceedings.

In his appellate brief, Benson pointed out that, in both January and February 2007, his attorney informed the trial court that Benson was refusing to speak with him. That fact, however, is not particularly probative of his competency and the propriety of his plea given that trial court had previously found Benson could control his behavior and, at his March 2008 plea hearing, Benson was cooperative and coherent. It is also notable that Benson's § 440.10 motion did not include any evidence concerning Benson's communications with defense counsel between February 2007 and March 2008 when Benson pled guilty.

Similarly, contrary to Benson's claim, his statements during the plea colloquy that he expected to be sent to a hospital did not undermine the validity of his plea. The trial court explained to Benson that it could only recommend Benson for medical and mental health treatment and Benson subsequently affirmed that no other promises had been made to him as part of his plea agreement. The fact that the trial court had to clarify this issue to Benson does not show that his plea was anything less than knowing or voluntary.

Benson also maintains that his plea was involuntary because the trial court failed to more fully explore Benson's understanding of the consequences of his plea. (Appellant's Br. at 36). This argument is also meritless. Notably, there is no evidence in the record indicating that Benson did not understand these consequences.

Finally, the state court's decision not to hold a hearing on Benson's motion to vacate was neither contrary to or an unreasonable application of federal law, nor an unreasonable

determination of the facts.  The Court previously addressed why the state court was not required to hold a second competency hearing prior to his sentencing.  For similar reasons, the state court was not required to hold a hearing on the motion to vacate.  Although the trial court did not have the benefit of the two competency evaluations prepared in 2009 in considering the motion to vacate, the trial court decided the motion to vacate only nine months after Benson's guilty plea hearing and Benson's motion to vacate did not offer any evidence that Benson's condition had changed in the interim or any other new evidence that would have necessitated a hearing.

Accordingly, Benson's claims concerning his motion to vacate his guilty plea provide no basis for habeas relief.

### 2. Benson's Unexhausted Claims

Benson's petition raises three unexhausted claims.  As explained below, these claims are procedurally barred.  Moreover, each of these claims is plainly meritless.

#### i. Ineffective Assistance of Counsel

Benson argues that he did not receive effective assistance of counsel.  However, he does not specify any acts or omissions that allegedly rendered counsel ineffective.  Because Benson did not raise any ineffective assistance claim in state court, any such claims are unexhausted.[4]  In any event, Benson's vague ineffective assistance claim is plainly meritless.

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his trial counsel's performance was so inadequate that his Sixth Amendment right to counsel was violated.  See Strickland v. Washington, 466 U.S. 668, 689–90 (1984).  Therefore, a petitioner

---

[4] To the extent any ineffective assistance of counsel claim that Benson seeks to raise is record-based (and there is nothing to suggest that Benson's claims would be anything but record-based), such a claim would be deemed procedurally barred.  Since Benson has already filed a direct appeal, he now cannot raise a purely record-based claim of ineffective assistance of trial counsel in state court.  See Sweet v. Bennett, 353 F.3d 135, 140 (2d Cir. 2003).  Thus, any such claim would be deemed exhausted, but procedurally barred.  See Dominguez, 2016 WL 542120, at *5.  Nothing in the record indicates that Benson would be able to overcome this procedural bar.

must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,' and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." <u>United States v. Cohen</u>, 427 F.3d 164, 167 (2d Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 688, 693). First, it must be demonstrated that "'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" <u>Wilson v. Mazzuca</u>, 570 F.3d 490, 502 (2d Cir. 2009) (quoting <u>Strickland</u>, 466 U.S. at 687). Next, a petitioner must show that he was prejudiced by said deficient performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Rosario v. Ercole</u>, 601 F.3d 118, 123 (2d Cir. 2010) (internal quotation marks and citation omitted).

There is nothing in the record suggesting that Benson received ineffective assistance.

### ii. "Coerced Confession"

Benson asserts that his "confession" at the plea hearing was "coerced" and violated his rights against self-incrimination because, according to Benson, neither the judge nor the prosecution was entitled to question him at the plea hearing. Since Benson did not raise this claim in his direct appeal, it would be deemed exhausted and procedurally barred. Benson cannot overcome this procedural bar. Furthermore, the claim is clearly meritless. Benson's contention that it was improper for the trial court to question him during the plea colloquy is frivolous. Such questioning by a court during a plea hearing is, of course, permissible.

The Court also notes that that there is no evidence in the record that Benson was coerced into pleading guilty. Although, at one point during the plea colloquy Benson asserted that he was agreeing "out of fear," the court questioned Benson further on this issue and Benson clarified that

he had not been threatened or coerced. (Plea Tr. 12.) Thus, to the extent that Benson is seeking to argue that plea was coerced based on that exchange, any such clam of coercion is plainly meritless.

### iii. Alleged Violations of the Fourth and Fifth Amendment

The handwritten Petition references, at various points, the Huntley/Wade suppression hearing and Benson's rights under the Fourth and Fifth Amendment. Although Respondent construes the Petition to raise only claims under the Fourth Amendment, the Court construes it to also raise claims under the Fifth Amendment concerning the Huntley/Wade hearing. As explained below, all of these claims are procedurally barred and plainly meritless.[5]

Because Benson did not raise any of these claims as part of his direct appeal, he would be procedurally barred if he now sought to raise any such claims in state court. As such, these unexhausted claims are deemed exhausted, but procedurally barred. See Dominguez, 2016 WL 542120, at *5. Benson does not offer any grounds for overcoming this procedural bar.

Benson's claims also fail for multiple other reasons.

Most importantly, any claims for violations of the Fourth and the Fifth Amendments are precluded because, as part of this plea, Benson's waived his right to appeal. In general, once a petitioner has pled guilty with the advice of counsel, "he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel" was deficient. Tollett v. Henderson, 411 U.S. 258, 267 (1973). The Supreme Court, however, recognized an exception to the Tollett rule for claims arising

---

[5] The record does not contain a decision by the trial court on Benson's suppression motions. The Court has, nevertheless, assumed that his suppression motions were denied after the hearing. If, however, the trial court never actually ruled on those motions and Benson elected to plead guilty prior to receiving a ruling on those motions, then there would be appear to be no basis at all for Benson to raise these claims in a habeas petition.

out of pre-plea suppression rulings when a state provides for appellate review of those issues after a guilty plea. <u>Lefkowitz v. Newsome</u>, 420 U.S. 283, 289–90 (1975).

New York law, as recognized by the <u>Lefkowitz</u> court, specifically permits a defendant to appeal suppression claims after pleading guilty. <u>See id.</u> at 290–91; N.Y. C.P.L. § 710.70(2) ("An order finally denying a motion to suppress evidence may be reviewed upon an appeal from an ensuing judgment of conviction notwithstanding the fact that such judgment is entered upon a plea of guilty"). However, New York law precludes the appeal of suppression claims where, as here, the defendant waived his right to appeal. <u>People v. Kemp</u>, 94 N.Y.2d 831, 833 (1999). As discussed above, Benson's plea—which included a waiver of his right to appeal—was voluntary, knowing, and intelligent. Accordingly, he cannot now, through a habeas petition, attack the validity of a pre-plea suppression decision or raise any other challenges asserting that evidence was obtained in violation of the Fourth or Fifth Amendment and, thus, should have been suppressed. <u>See</u> <u>Pena v. Graham</u>, No. 08-CV-3828, 2009 WL 5173819, at *13 (S.D.N.Y. Dec. 30, 2009); <u>Mapp v. Phillip</u>, No. 04-CV-1889, 2005 WL 1541044, at *5 (E.D.N.Y. June 29, 2005).

Benson's Fourth Amendment claims are also precluded on two additional grounds.

First, Benson maintains that his conviction was "obtained by use of evidence gained pursuant to an unconstitutional search and seizure." (Pet. at 5.) Benson, however, does not identity what evidence was allegedly obtained in violation of the Fourth Amendment or how the Fourth Amendment was violated. That alone is further reason to deny this claim.

Second, Benson is precluded by the Supreme Court's decision in <u>Stone v. Powell</u> from raising any Fourth Amendment claims in his petition.

Under <u>Stone v. Powell</u>, 428 U.S. 465 (1976), Fourth Amendment claims are generally "not reviewable by the federal courts when raised in a petition brought under § 2254 unless the state

prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in the state court." Graham v. Costello, 299 F.3d 129, 133–34 (2d Cir. 2002). This is true "whether or not [the prisoner] took advantage of the state's procedure" to litigate the Fourth Amendment claim. Id. at 134. The Second Circuit has limited federal habeas challenges to Fourth Amendment claims to two instances: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir.1992).

The first avenue is not available to Benson because "New York provides criminal defendants an opportunity to litigate Fourth Amendment search and seizure issues before trial." Haynes v. Ercole, No. 07-CV-3723, 2012 WL 1339434, at *4 (E.D.N.Y. Apr. 17, 2012) (citing N.Y. C.P.L. §§ 710.10–70 (McKinney)). And, there is no evidence of an unconscionable breakdown of New York's corrective procedures in this case.[7]

Accordingly, Benson's claims under the Fourth and Fifth Amendment are denied.

## II. CONCLUSION

For the reasons stated above, the Court DENIES Benson's petition. A certificate of appealability shall not issue because Benson has not made a substantial showing that he was denied a constitutional right. See 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis is denied for the purposes of any appeal.

---

[7] The mere fact that—on appeal and in this habeas proceeding—the parties were unable to locate a written or oral decision on the suppression motion from the trial court does not rise to the level of an unconscionable breakdown. Notably, it does not appear that any Fourth Amendment claims were even at issue in the suppression hearing.

See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).  The Clerk of the Court is respectfully directed to mail a copy of this Order to the pro se petitioner and to close the case.

**SO ORDERED.**

Dated: September 30, 2019
Central Islip, New York

 /s/ (JMA) 
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE